**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
at COVINGTON**

**CIVIL ACTION NO. 05-220-DLB**

**CAROLYN J. KING**                                                   **PLAINTIFF**

**vs.**                 **<u>MEMORANDUM OPINION & ORDER</u>**

**THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA**                                              **DEFENDANT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### I.  INTRODUCTION

Pursuant to 29 U.S.C. § 1001, *et seq.*, Plaintiff Carolyn King brings this ERISA action against Defendant Prudential Insurance Company of America ("Prudential") for termination of short-term disability benefits and denial of long-term disability.  This matter is presently before the Court upon Plaintiff's Motion for Summary Judgment (Doc. #17), to which Defendant filed a Response and Cross-Motion for Judgment (Doc. # 18).  Therefore, the time for filing of further responsive pleadings having expired, the motions are now ripe for the Court's review.

### II.  FACTUAL AND PROCEDURAL BACKGROUND

As Plaintiff concedes, this is a rather straight-forward case, at least in terms of the factual foundation.  Plaintiff, Carolyn King ("King"), obtained health care insurance with Prudential through her employer, Staples Inc. ("Staples").  King is employed with Staples as a customer service representative.  Her position at Staples is by definition sedentary,

requiring King to sit at a desk and answer telephone calls from customers with questions or complaints. King is 52 years old and severely obese. Her medical history reflects various maladies, many of which are likely weight-related, including diabetes, gastro reflux disease, sleep apnea, hypertension, and coronary disease.

In 2003, King suffered an initial onset of chest pains and was admitted to the hospital for an echocardiogram and angiogram. King continued working thereafter and did not suffer a reoccurrence of problems associated with her coronary disease until January 15, 2004, when she was admitted to the hospital with various symptoms, including facial numbness, left arm and leg weakness, and chest pains. A head CT scan was performed and revealed an evolving "frontoparietal infarct" or evidence of a stroke. The stroke was characterized with memory deficit, speech difficulties, and some left-sided paresthesias.

During her stay at the hospital, King was treated by Dr. James L. Armitage with Riverhills Healthcare, Inc. Dr. Armitage noted that King suffered from gastroesophageal reflux disease, some coronary artery blockage, and obesity. He also directed that she would need outpatient physical therapy and ordered an EEG, which came back normal. The MRA and MRI of her head also produced normal results. While still in the hospital, a second CT scan was performed which confirmed the stroke, and also indicated that it was possibly acute but appeared to be stable. King was switched off of the stroke medication herapin and instructed to take aspirin. King was subsequently discharged on January 19, 2004.

While still recovering from her stroke, King returned to the hospital in March of 2004 complaining of a severe headache and a reoccurrence of numbness. She explained that she was suffering from increasing headaches and consulted with Dr. Maureen Li, a

neurologist in partnership with Dr. Armitage. Another MRI was performed and revealed no acute stroke. The MRA tests were normal and although Dr. Li concluded that there was "no significant cerebrovascular blockage" and no "cardiac arrhythmia," there were some minor signs that her condition may have been worsening, though indications were that she was in substantially the same condition as after her stroke two months earlier.

Following continued therapy, King returned to work on April 15, 2004. However, on May 25, 2004, King was again admitted to the hospital with similar symptoms, including numbness and severe headaches. In view of her past stroke history, another CT scan was performed but showed no changes in King's condition. After various examinations, it was determined that the more recent problems were related to continued complicated migraine headaches, rather than her earlier stroke. Dr. Armitage opined that King might also have sleep apnea, which potentially contributed to the headaches, and recommended further testing. Dr. Imwalle, in coordination with Dr. Armitage, also directed Plaintiff to stop medicating herself with Tylenol PM nightly as a sleeping aid because it could produce "rebound headaches." King was treated for the migraine and discharged.

In June of 2004, after again returning to work, King was diagnosed with sleep apnea following assessment by the Sleep Management Institute of Kentucky. Prior to beginning treatment, King was required to undergo certain tests, but the day she was scheduled for testing in July of 2004, she again suffered a case of severe migraines with the associated numbness and tingling. King was subsequently admitted to the hospital. Following another angiography and MRI to check for any blood blockage, King was again diagnosed with complicated migraines, in addition to the continuing diagnoses of coronary artery disease,

sleep apnea, and hypertension. King was discharged on July 15, 2004, nearly a week after her hospital admission.

Prior to the commencement of her treatment for the sleep apnea, and concurrent with the July 2004 hospitalization, King ceased her employment with Staples and sought short term disability benefits upon the advice of her personal physician, Dr. Mina C. Kalfas. Dr. Kalfas recommended the cessation of employment because of King's continuing medical problems, including her heart disease, the prior stroke, ongoing chest pains, diabetes, and morbid obesity. On August 4, 2004, Prudential granted short term disability benefits through July 24, 2004, and proceeded to seek additional medical records to determine the length of King's approved disability. Thereafter, Prudential received sufficient records to extend King's short-term benefits through August 28, 2004.

In the interim, King was treated for ongoing chest pains by Dr. Patil, a cardiologist. Although Dr. Patil's examination did not reveal any major problems associated with King's coronary disease and earlier stroke, he ordered another angiogram be performed. Thereafter, Dr. Patil authorized King to return to work on August 26, 2004. Concurrently, a nurse for Prudential, Nelda Villano, reviewed the medical records available on King up to August 18, 2004. She concluded that, primarily because the most recent arch aortogram and arteriogram reports showed no evidence of vasculitis, an aneurysm, or significant stenosis, King's medical records did not support a continued impairment at that time and recommended no further extension of benefits. Nurse Villano noted, however, that no cardiac records had been received from Dr. Patil and after making a records request on August 20, 2004, Nurse Villano received and reviewed the new records and again found that disability was not supported past August 28, 2004.

Thereafter, King's personal physician, Dr. Kalfas, wrote a letter informing Prudential that he had recommended that King seek disability because her medical problems, including her strokes and coronary heart disease, prevented her from working. Dr. Kalfas indicated that King has suffered "multiple strokes" that he attributed to stress, even though the multiple problems and diagnoses after King's initial stroke were not stroke-related but instead were associated with complex migraines. In response to Dr. Kalfas' letter, Prudential sought all additional medical records from Dr. Kalfas in September of 2004.

Later that month, Plaintiff began suffering episodes of hallucinations in her bedroom. Paramedics were called but while transporting her down the stairs, the gurney broke and King unfortunately fell and hit the back of her head on the stairs. At the hospital, King again complained of numbness and headaches, which now included blurred vision. Concerned that she might be having another stroke, an entire new battery of tests were conducted, including a temporal artery biopsy ordered by Dr. Li. The CT scan of her head was negative, her neurological exam was normal, her chest x-ray was clear, the carotid arteriogram was "unremarkable," and her headaches were resolved "almost completely." King was subsequently discharged on September 23, 2004, four days after admission, with diagnoses of migraines, hypertension, and transient ischemic attacks.

Dr. Kalfas, in response to Prudential's denial of long-term disability benefits, wrote once more on King's behalf on November 1, 2004. He indicated to Prudential that King's medical condition made it difficult for her to continue gainful employment, stating: "[Work] has been impossible over the last year. . .due to her multiple medical problems, frequent hospital admissions and frequent exacerbation of conditions such as angina and neurological symptoms." Although his conclusion was not based on independent medical

tests, but rather his own diagnosis of King's medical problems in toto, Dr. Kalfas did conclude that King was disabled. Nevertheless, at the time of Dr. Kalfas' letter, King had already been granted short-term disability benefits by Prudential for the period of medical difficulty referenced by Dr. Kalfas; the issue was one of ongoing or long-term disability.

Upon King's second appeal for an extension of short-term benefits and application for long-term disability benefits after her most recent hospital stay, Prudential Claim Manager, Maura Martinez, consulted with internal Prudential physician Dr. Fallon. After reviewing the then current medical records, Dr. Fallon opined that King's file did support a short-term disability extension through her latest hospitalization discharge on September 23, 2004. Dr. Fallon noted that even though it was "reasonable to believe that [King] has recurrent mini-strokes that would affect her ability to [return to] her sedentary occupation," the reports following her September hospitalization indicated that King was making significant progress, including a drastic decrease in King's migraine episodes. Specifically, Prudential relied on Dr. Patil's conclusion that King was stable and cleared to return to her sedentary occupation with Staples by October 1, 2004.

Following another appeal by King in December of 2004, Claim Manager Martinez again conferred with Dr. Fallon who reviewed all available records in King's file through October of 2004, which included an October 7th office visit with Dr. Li revealing normal results from King's earlier biopsy. Dr. Fallon affirmed his prior decision that short-term disability benefits were warranted through September 30th. The decision to deny long-term benefits was also affirmed because Dr. Fallon believed that King's medical problems had sufficiently resolved to the point where a return to work was possible.

Following a final appeal by King in January of 2005, the matter was referred to Prudential's appeal committee. The committee directed that the medical records be updated with any new records after October of 2004 and that the decision to deny benefits would be revisited if records were available to evidence ongoing complications. Claim Manager Martinez reviewed the additional office notes received through November 24, 2004, which revealed that King had not received additional treatment for any of her potentially acute conditions. Prudential proceeded to contact King on January 26, 2005 to verify the lack of any additional medical records and office visits beyond those referenced in the November 24 office notes, which King confirmed. Consequently, the Prudential appeals committee voted to uphold the termination of short-term benefits as of October 1, 2004, as well as the denial of long-term disability. Prudential's final decision was communicated to King via letter on January 31, 2005.

### III.   ANALYSIS

**A.   Standard of Review**

Both parties stipulate that this action is governed by ERISA and that, because discretionary authority is expressly reserved by Prudential to administer benefits under the terms of the policy, the standard of review is consequently shifted from *de novo* to the "highly deferential arbitrary and capricious standard." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989).

Decisions reviewed under this standard are not deemed arbitrary and capricious if they are "rational in light of the plan's provision." *Id.* at 984. To that effect, as this Court has stated in the past, "determining whether the plan administrator's decision was arbitrary and

capricious means determining whether it was rational and in good faith, not [whether it was] right." *Dials v. SMC Coal & Terminal Co.*, 891 F. Supp. 373, 376 (E.D. Ky. 1995), *aff'd*, 89 F.3d 833 (6th Cir. 1996). However, "deferential review is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (internal citations omitted). In the end, an administrator's decision will be upheld "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence" based only on the record "available to the administrator at the time the final decision was made." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (citing *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 992 F.2d 1140, 1144 (6th Cir. 1991)); *Miller*, 925 F.2d at 986.

Plaintiff asserts that Prudential's decision to terminate King's short-term disability benefits and to deny long-term benefits was arbitrary and capricious because of three primary reasons, which will be addressed in turn: (1) the decision was tainted by conflicts of interest; (2) the review by Prudential was only record-based, rather than performing a physical examination; and (3) the administrative record demonstrates that King was disabled under the terms of the policy.

**B.     Conflicts of Interest**

Plaintiff identifies two perceived conflicts of interest. First, Plaintiff asserts that a conflict exists because Prudential "both decides if the Plaintiff is eligible for benefits and pays out those benefits." The Sixth Circuit has consistently found that "[t]his dual function creates an apparent conflict of interest." *Glenn*, 461 F.3d at 666. However, the mere existence of a conflict of interest does not require a court to abandon the otherwise appropriate standard of review – i.e., arbitrary and capricious – but rather the review under

-8-

this standard "should be shaped by the circumstances of the inherent conflict of interest." *Miller*, 925 F.2d at 984 (internal citation omitted). In other words, where the insurer is both the administrator and obligor, this facial conflict should merely be considered a "factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115.

Other than simply pointing out the existence of a conflict, Plaintiff does not specifically identify any evidence that would substantiate or even raise speculation of a claim that the apparent conflict of interest was indeed a *manifest* conflict in Prudential's determination of King's benefits. Therefore, assessing the proper weight to attach to the conflict "factor", as well as giving such factor "appropriate consideration," proves an arduous task.[1] *Glenn*, 461 F.3d at 666 (questioning, and partially deciding based upon, the district court's lack of explanation as to the conflict of interest at work, beyond mere recognition of the conflict). Nevertheless, as Defendant makes clear, "there is absolutely no evidence in the administrative record of self-interest by Prudential's case managers or that they otherwise acted with improper intent in reaching the decision." Accordingly, the presence of an administrator/obligor conflict in this case is afforded little weight because, as discussed in greater detail herein, Prudential's decision to terminate/deny benefits was reasoned, based on substantial evidence, and reached in good faith.

Second, Plaintiff also raises a conflict concern with respect to the use of a Prudential-employed physician who effectively decided (i.e., directly advised the administrator) whether or not King's conditions constituted a disability under the policy

---

[1] Perhaps in the absence of any evidence of bad faith in a particular case, beyond the apparent conflict, the conflict "factor" simply acts as a tipping-the-scales consideration in unusually close cases (this is not such a case). Otherwise, the factor itself has a rather undefined role where these conflicts are permitted to exist, which they unquestionably are in the present context.

-9-

terms. *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005) ("[W]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism."). This reality is not entirely distinct, however, from the administrator/obligor conflict discussed above. In fact, the two are akin for present purposes because there is no material difference between the administrator/obligor conducting a paper review of the medical records and a physician employed by the administrator/obligor conducting said review. Indeed, the latter would presumably be preferred because a medical professional is making the final recommendation.

Regardless, Prudential did not make its decision in King's case solely from the "work" of its physician, Dr. Fallon. The opinions of Dr. Fallon were based not on his own examination or testing of King, which ironically is itself a concern for Plaintiff, but rather on the complete picture of medical records from various neutral, third-party physicians, as well as King's personal physician. Similar to the administrator conflict, the physician conflict is a non-dispositive factor in this matter because Plaintiff fails to even suggest that the conflict biased Dr. Fallon's decision. To the contrary, Dr. Fallon's determination stemmed solely from the opinions and diagnoses of independent medical professionals who treated King during 2004.

**C.   Purely Paper Review**

Plaintiff also challenges the method of evaluation undertaken by Prudential in assessing the disability status of King. Plaintiff complains that Prudential utilized only a "pure paper review," rather than conducting their own in-person medical examination. The terms of the insurance policy do permit Prudential to require examination: "We may require you to be examined by doctors, other medical practitioners or vocational experts.

Prudential will pay for these examinations. We can require examinations as often as it is reasonable to do so." (A.R. 212). Although the policy language certainly permits Prudential to conduct examinations, the policy does not require that they do so and does not in any way limit benefits administration based on a file review only. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) .

Nevertheless, "as with other factors upon which [Plaintiff] relies to attack [Prudential's] decision-making process," the decision to conduct a pure paper review rather than a physical exam is "just one more factor to consider in [the] overall assessment of whether [Prudential] acted in an arbitrary and capricious fashion." *Id.* In *Calvert*, the Sixth Circuit elaborated on the impact of a pure paper review:

> Thus, while we find that Liberty's reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find that the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

*Id.* In the case *sub judice*, however, the record demonstrates that the review conducted by Prudential, and specifically Dr. Fallon, was unquestionably thorough as King's records were constantly updated and all records relevant to King's condition were reviewed. Prudential revisited King's case numerous times, both voluntarily and upon King's multiple appeals, and extended King's short-term benefits on several occasions.

Furthermore, although not always the case, the nature of King's health problems and the parameters of her sedentary job would most likely render the benefits of a "physical examination" negligible. It would seem far more "reasoned" and "principled" to rely upon hospital and specialist records in King's case, given her often dormant condition, rather than conduct a physical examination on any given day exploring her ability to sit at a desk

for several hours and talk on the phone. Such an examination would hardly speak to whether or not King was truly disabled and unable to perform her sedentary occupation. As such, the pure paper review "factor" in this matter does not add credence to Plaintiff's contention that Prudential's decision to deny benefits was arbitrary and capricious. *See Calvert*, 409 F.3d at 297 n.6 ("As we said, there is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician.").

### D. Benefits Determination

Moving away from the various procedural "factors" raised by Plaintiff, the crux of this action, as in most ERISA cases, is whether or not the administrative record demonstrates an arbitrary and capricious decision on the part of Prudential in their denial of disability benefits. The health care insurance policy in question, obtained by King through her employer, Staples, provides that coverage exists when the employee is "disabled" under the terms of the policy. In that regard, the pertinent provisions of the policy are:

> **How Does Prudential Define Disability?**
>
> You are disabled when Prudential determines that:
>
> - you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
> - you have a 20% or more loss in your **indexed monthly earnings** due to that **sickness** or **injury**.
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

(A.R. 212) (emphasis in original).

-12-

Plaintiff argues, generally speaking, that Prudential's decision to deny King's claim was necessarily arbitrary and capricious simply because the record evinces that King was indeed disabled as defined by the policy. This argument alone is, of course, insufficient because a decision does not have to be "correct" – assuming such a determination is even possible – for it to satisfy the arbitrary and capricious standard (i.e., based on a principled reasoning process and supported by substantial evidence). More specifically, however, Plaintiff does identify "several crucial aspects" that allegedly render Prudential's decision "inadequate" for purposes of this Court's review.

First, Plaintiff contends that Prudential failed to base their determination on an inquiry into the ability of King to perform her actual job, rather than a generic sedentary occupation. Plaintiff concedes that King's occupation is inherently sedentary but instead asserts that the stressful nature of her specific job exacerbates her medical symptoms. Although Plaintiff does not detail what aspects of the customer service representative's duties would cause significant stress, the Court presumes that answering calls from upset customers would be the primary origin of stress.

Regardless, as Defendant recognizes, there is nothing in the record to permit an examination based on the specific aspects of King's job. At no point did King, or her personal physician, Dr. Kalfas, suggest that there was anything unique about her sedentary position, only that her condition prevented her from gainful employment. Prudential cannot be required to assess King based on job characteristics that allegedly exacerbate King's conditions when the medical records from the numerous treating physicians, including King's own physician, never suggest or even allude to a problem related to King's specific sedentary occupation. Dr. Fallon and Prudential determined, based on the record

indicating an apparently improving condition and treating cardiologist Dr. Patil's recommendation that King return to work, that King was able to perform her sedentary position. The fact that Prudential's determination was based purely on a sedentary job description, as opposed to the specific, yet undisclosed, nature of King's individual sedentary position, does not necessarily render the decision to deny benefits arbitrary and capricious.[2]

Second, Plaintiff contends that Prudential failed to properly account for the opinions of King's personal physician, Dr. Kalfas. However, Prudential clearly considered and gave weight to Dr. Kalfas' first letter, dated September 1, 2004, when they later decided, based also on King's hospital admission in mid-September, that short-term disability benefits were warranted through September of 2004. As to consideration of Dr. Kalfas' second letter, dated November 1, 2004, Prudential determined that the letter "demonstrated that [King] would be considered impaired for a closed period." It is clear that Prudential, including their physician, Dr. Fallon, took the opinions of Dr. Kalfas into account, whether or not Prudential's ultimate determination in light of those opinions was correct.

---

[2] The Sixth Circuit's recent decision in *Elliott v. Metropolitan Life Ins. Co.* confirms the importance of a specific occupational inquiry when making a disability determination in cases involving "own occupation" policies. *See* No. 05-6633, 2006 U.S. App. LEXIS 32296 (6th Cir. Nov. 15, 2006) (scheduled for publication). However, *Elliott* is distinguishable from the case *sub judice* because, unlike the plaintiff's job in *Elliott*, King's position with Staples as a customer service representative is fundamentally sedentary. *See id.* at *14-18 (The plaintiff's job in *Elliot*, although arguably sedentary to a certain extent, involved numerous job responsibilities that required specific evaluation by the administrator as to whether Elliott "could perform her own occupation."). Because there were no specific job characteristics identified by Plaintiff that may prevent her from otherwise performing the responsibilities of her position in the present action, an evaluation and assessment based on a generic sedentary occupation is not improper, especially considering the reality that every job – even the most basic – necessarily involves some degree of stress.

Plaintiff further asserts that Prudential did not adequately rebut the determination by Dr. Kalfas that King was unable to work and, therefore, disabled. "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). In that regard, the record demonstrates that Prudential did give at least some weight to Dr. Kalfas' opinions, despite Prudential's ultimate determination that King was not disabled. The finding by Dr. Kalfas that King was disabled is undeniably strong evidence, but other evidence contradicts the opinion of Dr. Kalfas, including Dr. Patil's opinion that King was able to return to work and Dr. Fallon's opinions, based on the totality of King's medical records, that King was not disabled and could perform her sedentary position.

To that effect, the Supreme Court has stated that: "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* In the *Nord* holding, the Supreme Court also rejected outright the judicial imposition of a treating physician rule, whether or not such rule required more weight to be afforded to a treating physician or simply that the administrator must explain why they make a decision not in accord with the treating physician's opinion. *See id.* at 834 n.4. As such, because Prudential was not obligated to allocate greater weight to the opinions of Dr. Kalfas, Prudential's ultimate reliance on both Dr. Patil's recommendation and Dr. Fallon's review of King's records – a review that Dr. Kalfas apparently did not conduct – does not constitute an arbitrary and capricious determination by the administrator.

Finally, Plaintiff asserts that Prudential failed to take into account all of King's medical records and conditions. As an initial matter, the record demonstrates that Prudential made an effort to update King's records on numerous occasions over a rather limited period and all indications are that Prudential possessed and considered all relevant records at each decision stage. Nonetheless, in addition to again submitting that Prudential failed to account for the stressful nature of King's job and the correlation to her health problems, Plaintiff maintains that Prudential ignored the fact that Plaintiff suffered an additional TIA (mini-stroke) on November 24, 2004, the date upon which Prudential believed the medical records for King ended.

According to Prudential, its decision to deny benefits for the last time in late January of 2005 was partially based on the lack of any serious problems for King beyond her September 2004 hospital stay. The last record Prudential obtained was King's office visit on November 24, 2004 with Dr. Kalfas, which apparently indicated that her symptoms were stable. Because of the gap in records, Prudential called King on January 26, 2005 to verify her status before making their final appeal decision. King confirmed with Prudential that, as the records correctly indicated, there were no more incidents subsequent to her November office visit with Dr. Kalfas. Therefore, whether or not the claimed incident

actually occurred, King did not reveal said incident to Prudential and, either way, the records did stop on November 24, 2004.[3]

### IV.   CONCLUSION

As Plaintiff acknowledges, a Court may only consider the evidence available to the administrator at the time the decision was made and should uphold an administrator's decision if reasonable, not necessarily correct.  *See Miller*, 925 F.2d at 986; *Johnson v. Eaton Corp.*, 970 F.2d 1569 (6th Cir. 1992).  In this case, there are various issues that inevitably factor into the Court's review of whether Prudential's decision to deny benefits was arbitrary and capricious.  These include the conflicts of interest, the purely paper review conducted by Prudential and their physician Dr. Fallon, and Prudential's disagreement with the conclusory opinion of King's personal physician, Dr. Kalfas, who believed that King was indeed disabled.  However, the dispositive question in ERISA denial

---

[3] With regard to the alleged missing records and the administrator's decision-making analysis, Prudential's internal records indicate the following:

> Our records show that [employee] had multiple hospitalizations over a closed period of time and the [Appeals Committee] had suggested to call [employee] and find out if there has been any further treatment due to her residual symptoms from the stroke.  The medical documentation on file supports stabilization after last hospitalization in 9/04 but the office notes ended on 11/24/2004 just after her hospitalization.  11/24/200 [office visit] notes indicated that stroke/cva is stable.  Therefore, we confirmed on 1/26/05 with [employee] that there was no further treatment beyond her office visit with Dr. Kalfas (PCP) on 11/24/04 for her stroke-like symptoms . . . .  Since [employee] has not seen any doctors beyond 11/24/04 for her stroke-like symptoms and there are no other outstanding medical records to obtain, [Appeals Committee] has voted to uphold our decision to terminate [employee's short-term disability] benefits effective 10/1/04 and disallow [employee's long-term benefits] claim.

(A.R. 142).  Although there is some confusion as to what happened on November 24, 2004, if Plaintiff is referring to the office visit with Dr. Kalfas only, then Prudential clearly took the visit into consideration, though still deciding to deny benefits because of the two-month cessation of stroke-related symptoms.  If Plaintiff is referring to a hospitalization on said date, then King failed to reveal this event to Prudential and it cannot be accounted for in the review of Prudential's decision.

-17-

of benefits cases is "not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

To that effect, the overall picture in this case demonstrates that Prudential's decision, whether or not the correct one, was reached in good faith, was the result of a "deliberate, principled reasoning process," and was based on substantial evidence. This aggregation of supporting evidence relied upon by Prudential includes:

(1) the treating cardiologist, Dr. Patil's, opinion that King could return to work;

(2) the Prudential physician, Dr. Fallon's, opinion that King was not disabled, which was based on multiple reviews of all of King's medical records;

(3) the fact that only one of King's many treating physicians, her personal physician, Dr. Kalfas, believed she was disabled;

(4) the fact that Dr. Kalfas' opinion was not based on his own testing or review of all other treating physicians' records;

(5) that as of her last hospital stay, King's migraine conditions had significantly improved and her heart-related problems had not worsened; and

(6) that at the time Prudential made their final determination, records revealed that King had not suffered a reoccurrence of symptoms for nearly two months.

In the end, "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *McDonald*, 347 F.3d at 169 (quoting *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). Accordingly, Prudential's denial of benefits in this case does not approach the arbitrary and capricious threshold. The administrator's decision is therefore upheld.

In accordance with the foregoing analysis, **IT IS ORDERED** that:

(1) Plaintiff's Motion for Summary Judgment (Doc. #17) be, and hereby is, **DENIED**;

(2) Defendant's Cross-Motion for Judgment (Doc. #18) be, and hereby is, **GRANTED**;

(3) Plaintiff's Complaint be, and hereby is, **DISMISSED WITH PREJUDICE** and **STRICKEN** from the active docket of this Court.

(4) A Judgment in favor of Defendant will be entered concurrently herewith.

This 19th day of January 2007.



Signed By:
*David L. Bunning*   DB
United States District Judge

G:\DATA\Opinions\2-05-220-King (MOO).wpd